UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| In re ) | |
| ) | |
| NEW LIFE INTERNATIONAL, ) | Case No. 13-10974-RM3-11 |
| dba THE NEW LIFE GROUP, ) | |
| dba NATIONAL COMMUNITY ) | |
| FOUNDATION, ) | |
| dba BAND ANGELS, ) | |
| ) | |
| Debtor. ) | |
| ) | |

## VERIFIED STATEMENT OF ROBBY MCGEE IN SUPPORT OF FIRST DAY MOTIONS

Robby McGee, under penalty of perjury, states as follows:

1. I am, and at all times relevant hereto was, over eighteen (18) years of age. I am the President of New Life International ("NLI" or "Debtor"). In that capacity, I have intimate knowledge of Debtor's day-to-day operations and financial affairs.

2 Except as otherwise indicated, all facts set forth in this Verified Statement are based upon my personal knowledge, my review of the relevant documents, or my opinion, based upon my experience and knowledge of Debtor's operations and financial conditions. If I were called to testify, I could and would testify competently to the facts set forth herein. I am authorized by Debtor to submit this Verified Statement and make the statements herein. This Verified Statement is given in support of the following Motions (the "First Day Motions"), which were filed concurrently herewith in the above-referenced Chapter 11 case on December 31, 2013:

    A. Expedited Motion for Permission to Maintain and Use Existing Bank Accounts, Cash Management System and Business Forms (the "Bank Accounts Motion");

B. Expedited Motion for Permission to Pay Prepetition Benefits, Taxes, and Related Expenses (the "Employee Motion");

C. Expedited Motion Pursuant to 11 U.S.C. §§ 105(a), 366(a) and 507 (I) for Authority to Pay Prepetition Utility Claims, (II) to Determine Adequacy of Assurance of Payment for Future Service from Utilities and (III) to Establish Procedures for Determining Requests for Additional Assurance (the "Utilities Motion");

D. Expedited Motion for Extension of Time to File Schedules and Statement of Financial Affairs (the "Extension Motion"); and

E. Debtor's Expedited Motion to Limit Subsequent Notices and Remove Parties from Full Matrix (the "Notice Motion").

## I. BACKGROUND INFORMATION

3. New Life International ("NLI") was originally incorporated under the name "World Bible Society" on February 28, 1979, as a nonprofit corporation under the laws of the State of Tennessee. According to its charter, as amended, NLI is a public benefit corporation, and a religious corporation, within the meaning of the Tennessee Nonprofit Corporation Act. Among other things, NLI's charter authorizes NLI to solicit, receive and expend the proceeds of fees, donations, grants, bequests and legacies in furtherance of its corporate purposes.

4. NLI includes National Community Foundation, The New Life Group, and Band Angels, all unincorporated divisions of NLI. NLI also conducts operations and implements its investment decisions via the following wholly-owned subsidiaries: World in Need, LLC, New Life Property Holdings, Inc., New Life Property Holdings II, Inc., New Life Holdings, Inc. (and its wholly-owned subsidiary, 131 Third Avenue, LLC), New Life Cabins, Inc., New Life Development, Inc., Northgate Holdings, Inc. and New Life Digital Media, LLC. All of the

majority-owned subsidiaries, with the exception of 131 Third Avenue, LLC and New Life Digital Media, LLC, are non-profit organizations.

5. NLI's sources of revenue include donations of goods, money and other property, investment earnings, sale of Christian-themed merchandise and earnings from other real estate and operating entities. The real estate and operating entity operations include rental of commercial and residential property, investment in a development property and investment in a compact disc replicating company.

6. Since 1997, a decided majority of the donations received by NLI have come in transactions in which NLI issued to the donor either a charitable gift annuity ("CGA"), or a bargain-sale installment note ("ChIP"). CGAs and ChIPs are recognized under the Internal Revenue Code. In addition, most states recognize CGAs and ChIPs, although the regulatory treatment of them varies widely from state to state. Under gift annuity agreements, NLI receives certain amounts partly in exchange for obligations to pay certain fixed installments during the single or joint lifetime of each donor. Under charitable bargain sale obligations, when the seller has elected to be paid pursuant to the Installment Method in Section 453 of the Internal Revenue Code, NLI has received certain amounts partly in exchange for obligations to pay certain fixed installments during a fixed period of time, generally ten to twenty years.

7. NLI has been granted an exemption under Internal Revenue Code Section 501(c)(3). In addition, the corporation qualifies for the charitable contribution deduction under Section 170(B)(1)(A) and has been classified as an organization that is not a private foundation under Section 509(a)(2).

## II. STATEMENTS IN SUPPORT OF EXPEDITED MOTION FOR PERMISSION TO MAINTAIN AND USE EXISTING BANK ACCOUNTS, CASH MANAGEMENT SYSTEM, AND BUSINESS FORMS

8. As of the Petition Date, Debtor maintained the following bank accounts:

   A. A local operating account at Pinnacle Bank in Nashville.

   B. A local payroll account at Pinnacle Bank in Nashville.

   C. Two local depository accounts at Pinnacle Bank in Nashville.

   D. A local depository account at Pinnacle Bank in Nashville in the name of New Life International d/b/a The New Life Group.

9. Debtor's income is deposited into the various accounts, which Debtor uses to pay its ordinary trade vendors, its landlord, debt service, property maintenance expenses, taxes, employment and payroll-related expenses, and generally all of its disbursements.

10. In my opinion, on behalf of the Debtor:

   A. Debtor should be allowed to use its pre-existing bank accounts as described above, and not be required to close each prepetition bank account as of the Petition Date or open new postpetition bank accounts with checks imprinted with "Debtor-in-Possession."

   B. That compliance with such requirements would unnecessarily disrupt Debtor's business, impair Debtor's efforts to stabilize operations at a critical stage of this case, and would not confer any benefit on those dealing with Debtor.

   C. That maintaining the existing accounts is vitally important to Debtor because a large portion of the funds that it receives and disburses are transferred electronically. The closing of existing accounts and opening of new accounts would cause confusion and disruption, and materially slow the receipt and disbursement of funds at this critical time in

Debtor's business. In addition, the Debtor has recently transferred its bank accounts to Pinnacle Bank, a depository approved by the Office of the United States Trustee, Region 8, and opening a second new group of accounts would cause unnecessary disruption to the Debtor's operation.

   D. That all parties in interest will be served by preserving business continuity and avoiding the disruption and delay to Debtor's business activities that would necessarily result from closing the accounts and opening new accounts.

   E. That it is in the best interests of the Debtor that the Court deem Debtor's prepetition bank accounts to be Debtor-in-Possession accounts, and authorize their maintenance and continued use, in the same manner and with the same account numbers, styles, and document forms as during the pre-petition period.

   F. That it is in the best interests of the Debtor for the Debtor to continue to use its correspondence and business forms, such as purchase orders, checks, letterhead, envelopes, insurance and reimbursement forms, substantially in the forms existing immediately prior to the Petition Date, without reference to its status as Debtor-in-Possession. Both Debtor and the parties with which it regularly deals depend on the uniformity of these forms to conduct their transactions with maximum efficiency. Substantial time and expense would be required to print new business forms. Furthermore, use of new forms may slow the pace of Debtor's everyday transactions with parties which are accustomed to Debtor's current forms.

   G. That if Debtor needs to purchase new business forms during the pendency of these cases, such forms not be required to include a legend referring to the Debtor as Debtor-in-Possession.

   H. That continuation of its prepetition accounts, cash management system and business forms will not negatively affect the rights of any creditors or parties in interest.

I. That the granting of this Motion will not affect the reports and information that Debtor is required to provide, or otherwise affect its conduct as Debtor-in-Possession.

J. That if Debtor is not permitted to maintain and utilize its existing accounts, cash management system and business forms prejudice will result, including (i) disruption in Debtor's ordinary financial affairs and business operations, diverting it from its duties as Debtor-in-Possession; (ii) delay in the administration of Debtor's estate; and (iii) cost to the estate to set up new cash and deposit systems, open new accounts, print new business forms, and print new checks.

### III. STATEMENTS IN SUPPORT OF EXPEDITED MOTION FOR PERMISSION TO PAY PREPETITION BENEFITS, TAXES, AND RELATED EXPENSES

11. All of NLI's eight (8) employees are salaried, and NLI pays its employees twice a month, nominally on the 15th and the last day of the month. If the 15th or the last day of the month falls on a weekend or a holiday, NLI pays its employees on the last workday prior to the holiday or weekend. Thus, NLI has two pay periods per month, one starting on the first day of the month and ending on the 15th, and another starting on the 16th of the month and ending the last day of the month. For example, the pay period that commenced on December 1 ended on December 15, 2013, a Sunday, and employees were paid for that pay period on the preceding Friday, December 13, 2013. The pay period that commenced December 16 ends on December 31, 2013, a Tuesday, and employees were paid for that pay period early, on Monday, December 23, 2013 to accommodate the Debtor's filing of its petition. Of course, NLI withholds and pays required federal income withholding taxes from employees' compensation. The next pay period begins on Wednesday, January 1, 2014.

12. The Debtor reimburses its employees for mileage when employees use their personal vehicles for company business. At the time of filing of this Application, the Debtor anticipates that it will owe prepetition mileage reimbursement.

13. The Debtor may be required to pay to or on behalf of its employees accrued vacation or sick leave not taken, garnishments, mileage reimbursement, workers' compensation, flexible spending account, or other compensation or benefits that accrued prepetition but have not yet been paid.

14. None of the employees, pursuant to the authority sought by this motion, will be paid more than $11,725.00, the maximum amount allowable as a priority claim under 11 U.S.C. § 507(a)(4) and (5), for cumulative prepetition wages, benefits and expenses.

15. Debtor pays unemployment taxes to the States of Tennessee and federal unemployment taxes on a bi-monthly basis. The payments for which the Debtor seeks authority would include amounts for services that were performed prepetition and amounts for customary employment taxes.

16. In my opinion, on behalf of Debtor:

A. The employees are essential to the ongoing operations of the Debtor's business, and are absolutely critical to the success of Debtor's reorganization efforts. Payment of the Employee Expenses will not be prejudicial to creditors. To the contrary, payment of the Employee Expenses will ensure continued, uninterrupted operations of the Debtor's business, and will contribute to the value of the Debtor's estate. The payment of the Employee Expenses will ensure the success of Debtor's efforts in seeking Chapter 11 relief for the benefit of the creditors of the estate.

## IV. STATEMENTS IN SUPPORT OF EXPEDITED MOTION PURSUANT TO 11 U.S.C. §§ 105(A), 366(A) AND 507 (I) FOR AUTHORITY TO PAY PREPETITION UTILITY CLAIMS (II) TO DETERMINE ADEQUACY OF ASSURANCE OF PAYMENT FOR FUTURE SERVICE FROM UTILITIES AND (III) TO ESTABLISH PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ASSURANCE

17. Before this case was filed, Debtor contracted for utility services rendered by various utility companies.

18. In the normal conduct of its business, Debtor uses gas, water, electric, telephone, and other services provided by utility companies (the "Utility Companies"). Utility Companies currently used by Debtor, along with account numbers, are listed in **Exhibit A**, attached to the Utilities Motion and incorporated herein by this reference. The Utility Companies will be notified of this Motion and the associated Proposed Order as described in Paragraph 3 of the Utilities Motion.

19. In the normal course of its operations, Debtor uses a standard cash management system for payment of the Utility Companies for services used by the Debtor.

20. Debtor paid its utility bills in the ordinary course of business prior to the filing of this Case. All utility bills received prepetition were paid prepetition. Thus, the only prepetition services for which payment has not been made are those that had not been billed as of the petition date, i.e., the current billing cycle.

21. In my opinion, on behalf of Debtor:

   A. Utility services are essential to Debtor's ability to sustain its operations during the Chapter 11 case. An interruption of utility service would severely disrupt the Debtor's operation of its business.

   B. Payment for the services rendered by the Utility Companies prepetition, along with the administrative expense priority provided pursuant to 11 U.S.C. §§ 503(b) and

507(a)(1), adequately assure payment to providers of utility services without the need for deposits or other security. Debtor has, and anticipates that it will continue to have, sufficient funds from operations to make timely payments for all postpetition utility services.

C. An interruption of utility service would severely disrupt Debtor's business operations. In contrast, the Utility Companies will not be prejudiced by the continuation of such service because they will be paid for all amounts they are owed prepetition, and will have adequate assurance that they will be paid all postpetition utility charges as they become due.

## V. STATEMENTS IN SUPPORT OF EXPEDITED MOTION FOR EXTENSION OF TIME TO FILE SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS

24. Debtor employs only eight (8) employees, and the number of annuities, properties, creditors, and annuitants that the Debtor must list on its Schedules and Statement of Financial Affairs is extensive.

25. In my opinion, on behalf of Debtor:

A. The volume of work required of these employees to complete the Schedules and Statement of Financial Affairs in the immediate future justifies Debtor's request for an extension of time to file its Schedules and Statement.

B. Additionally, the granting of an extension will aid the Debtor in filing Schedules and a Statement that are as complete and accurate as possible, thereby benefiting all parties in interest in this case, allowing them to receive notice as soon as possible, and minimizing the need for amendments.

C. Even though the Debtor has already begun the extensive process of gathering the necessary information to prepare and finalize the Schedules and Statement, the process is far from complete. An additional sixteen days will provide the time to ensure accuracy of the Debtor's Schedules and Statement.

## VI. STATEMENTS IN SUPPORT OF DEBTOR'S EXPEDITED MOTION TO LIMIT SUBSEQUENT NOTICES AND REMOVE PARTIES FROM FULL MATRIX

26. Debtor will file a matrix that includes all parties required (or potentially required) to receive notice under Fed. R. Bankr. P. 2002 (the "Full Matrix"). The Full Matrix consists of several hundred parties to various types of contracts with Debtor, including holders of annuity contracts, holders of promissory notes, as well as ordinary course creditors and other interested parties.

27. In my opinion, on behalf of Debtor:

A. Service to the entire Full Matrix, even with electronic service, will be extremely costly and burdensome.

B. The interests of economy to Debtor's estate will be served, without harm to the interests of creditors or other interested parties, by the limited notice and service of documents, pursuant to Fed. R. Bankr. P. 2002, to the following, as may be amended from time to time: (i) the Debtor; (ii) counsel for the Debtor; (iii) the twenty (20) largest unsecured creditors of the Debtor *or* members of the Official Unsecured Creditors Committee if and when such a committee is established; (iii) counsel for the Official Unsecured Creditors Committee if and when such counsel is retained; (v) the U.S. Trustee; (vi) all secured creditors or their counsel; (vii) Debtor's financial consultant; (viii) counsel, creditors and other interested parties who have heretofore or shall hereafter file a request to receive notice under Fed. R. Bankr. P. 2002(g); (ix) the appropriate regulatory official for each state in which Debtor conducts business; and, (x) parties entitled to notice under Fed. R. Bankr. P. 2002(j) (the "Limited Service List").

C. Any party on the Limited Service List that requests electronic service through the Court's CM/ECF system will be given notice in accordance with the Court's

10

Case 3:13-bk-10974    Doc 16    Filed 12/31/13    Entered 12/31/13 17:56:25    Desc Main
Document    Page 10 of 12

procedures for such electronic notice and no further or additional notice to such parties shall be required.

D. Any party that will be directly affected by any proposed action or filing with the Court will be given notice of that particular action or filing at Debtor's last known address for such party or such address as the party provides to Debtor, in accordance with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, whether or not such party is included on the Limited Service List.

E. Notice will not be limited for any notices regarding plan confirmation; motions and orders regarding dismissal or conversion; motions and orders regarding the appointment of a trustee; or deadlines for filing claims.

F. Any party with an interest in the case may file a request for notices under the Federal Rules of Bankruptcy Procedure and, upon the filing of such a request, shall be added to the Limited Service List.

G. Debtor is a party to certain contracts with individuals, generally referred to as "Donor Advised Contracts" and "Family Foundation Contracts." These contracts are similar to one another, and are generally described as follows: In past years, individual donors made contributions to Debtor under either of these types of contracts. For example, Mr. Donor made a $100,000.00 contribution. Under federal tax law, Mr. Donor was entitled to take a full $100,000.00 charitable deduction from his income tax return for the year in which the contribution was made. He has no further legal or equitable interest in the funds that he donated. The funds are not segregated. The "account" attributed to Mr. Donor is only a bookkeeping entry and is not a liability of Debtor. All of the contributions legally belong to Debtor from and after the time they are made. Debtor is entitled to contribute the available funds (or income from

11

the investment of such funds), in the exercise of its own judgment, in such a way as to further Debtor's Christian missions. However, Mr. Donor was allowed to advise or suggest to Debtor how he would like for Debtor to use the funds (or income therefrom). The final decision as to the use of these funds is Debtor's; Debtor is not required to comply with Mr. Donor's suggestion or advice.

H. Absent further order of the Court, Debtor is not authorized to make charitable donations and believes that it is unlikely that it will be able to make donations in the future. It does not seem likely that the results of the orderly liquidation of the company's affairs will produce an excess of assets above that which is required to satisfy the claims of creditors, including the CGAs and ChIPs. Hence, the concept of donor advice is moot. Since donors can no longer make suggestions or give advice to Debtor as to the use of donated funds, and Debtor is the full outright owner of the assets, donors under Donor Advised Contracts and Family Foundation Contracts are neither creditors nor parties in interest in this case, should be removed from the Full Matrix, and should receive no further notices or documents in this case unless they specifically request to do so.

Verified statement signed under penalty of perjury, December 31, 2013.

/s/ Robby McGee
Robby McGee